IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SHANNON TIPTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:17-CV-588-WKW |
| | ) | [WO] |
| HOUSTON COUNTY BOARD OF | ) | |
| EDUCATION, a local education | ) | |
| authority; and TIM PITCHFORD, | ) | |
| BOBBY HARRELL, KEN LANE, | ) | |
| MARTY COLLINS, GARY COX, | ) | |
| and JIMMY KILGORE, in their | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Shannon Tipton wanted to be the Accountability Coordinator for the Houston County school system, but she could get that job only if the Houston County Board of Education hired her.  In May 2017, the Board voted four-to-three *not* to hire her.  Why?

Tipton thinks she did not get the job because she campaigned for David Sewell when he ran for county superintendent of education.  Sewell won that race by beating Matt Swann, a close relative of two Board members, in the March 2016 primary.  So Tipton brings this suit for First Amendment retaliation against the Board, the Board members who voted against her, the superintendent who Sewell replaced, and a

retired Board member who never had the chance to vote on her nomination.

Defendants insist they did not know that Tipton supported Sewell. They also proffer legitimate reasons for their actions. Each Board member who voted against Tipton says there was no need to hire anyone for the Accountability Coordinator job. And, in fact, that position is vacant today; other employees perform its duties, and the Board saves money as a result. Several Defendants were also concerned about Tipton's work history and ability to get along with others. Two Board members who voted for Tipton recognized these concerns about saving money and Tipton's ability to get along with others. The third Board member who voted for Tipton is her cousin, and he has said that she can be hard to get along with.

To survive summary judgment, Tipton must show that a reasonable jury could find that each Defendant *knew* she supported Sewell and was *motivated* to retaliate against her because of it. Yet there is only cognizable evidence that one Defendant knew about her support for Sewell. And no reasonable jury could find, based on the cognizable evidence, that Tipton's political activities motivated any Defendant. As a result, Defendants' motion for summary judgment is due to be granted.

## I. JURISDICTION AND VENUE

The court has federal-question subject-matter jurisdiction. 28 U.S.C. §§ 1331, 1343. The parties do not dispute personal jurisdiction or venue.

## II.  STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The framework and rules that govern motions for summary judgment ought to be familiar by now.  But some repetition seems to be required.

As the moving party, Defendants bear the initial responsibility of showing that summary judgment is proper.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–58 (1970).  This responsibility includes identifying the parts of the record that reflect the lack of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c)(1)(A).  But if Tipton must prove a fact at trial, Defendants may simply assert (without citing the record) that she "cannot produce admissible evidence" to support that fact.  Fed. R. Civ. P. 56(c)(1)(B).

If Defendants meet their burden, then the burden shifts to Tipton to show that there is a *genuine* dispute about a *material* fact.  *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To meet her burden, Tipton "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Instead, she must show there is sufficient evidence for a reasonable jury to return a verdict in her favor.  *Anderson*, 477 U.S. at 252.  Evidence that "is merely colorable,

or is not significantly probative," will not create a genuine dispute. *Id.* at 249–50 (cleaned up). Nor will the "mere existence of a scintilla of evidence." *Id.* at 252.

In determining whether a genuine dispute exists, the court views the evidence — and all reasonable inferences drawn from it — in the light most favorable to Tipton. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010). At the same time, however, the court draws inferences "only to the extent supportable by the record." *Id.* (cleaned up); *see Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986) (noting "inferences based upon speculation are not reasonable"). And not everything labeled "evidence" is cognizable; the court "may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005). Hearsay rules, for example, still apply. *See Macuba v. Deboer*, 193 F.3d 1316, 1324 (11th Cir. 1999). And testimony must be based on personal knowledge. *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007); *Pace v. Capobianco*, 283 F.3d 1275, 1278–79 (11th Cir. 2002).

In short, "mere conclusions and unsupported factual allegations" will not defeat summary judgment. *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989) (cleaned up). Tipton must have evidence — not just "speculation, innuendo and rhetoric." *Johnson v. Champions*, 990 F. Supp. 2d 1226, 1244 (S.D. Ala. 2014).

## III.  BACKGROUND

Tipton brings this lawsuit against the Houston County Board of Education and six individuals: Tim Pitchford, Bobby Harrell, Jimmy Kilgore, Ken Lane, Gary Cox, and Marty Collins (together, Defendants).  The background for this lawsuit is simple.  First, Tipton supported David Sewell when he ran to be the county superintendent of education.  Second, after Sewell won, Sewell wanted Tipton to take his job as the Accountability Coordinator.  Third, the Board voted not to hire Tipton.

### A.    <u>Tipton supported Sewell in his successful bid to become superintendent.</u>

The Houston County Board of Education administers and oversees the county public school system in Alabama's southeasternmost county.  Ala. Code §§ 16-8-8, 16-8-9.  The Board has seven members.  *Id.* § 16-8-2.  It also has a chief executive officer, the county superintendent of education.  *Id.* §§ 16-9-1, 16-9-13.  Like the seven board members, the superintendent is an elected official.  *See id.* § 16-9-8. But the superintendent has no vote on the Board.  *Id.* § 16-8-7.  Instead, he works for the Board.  *See Edmonds v. Bronner*, 547 So. 2d 1172, 1176 (Ala. 1989).

From 2004 to 2016, Defendant Tim Pitchford was the superintendent.  (Doc. # 52-1, at 74.)  When he decided not to seek reelection, two candidates — David Sewell and Matt Swann — vied to take his place.  Both Sewell and Swann are Republicans, so they had to square-off in the March 2016 primary.  The race was not contentious between them, however.  In fact, Sewell and Swann went together to file

campaign paperwork, and they stayed on good terms during and after the election. They still chat about once a week. (Doc. # 52-1, at 82–87.)

Tipton campaigned for Sewell in the primary. She donated $100, put up signs (including one in her yard), passed out flyers, wore a campaign t-shirt, put a magnet on her car, and posted on Facebook about her support. Her husband helped build signs, and her family members put up signs in their yards. None of that is surprising given that Tipton and Sewell are friends. They have known each other since he was her middle-school math teacher. (Doc. # 52-1, at 7, 19–23, 111; Doc. # 57-2, at 35.)

Sewell defeated Swann in the primary. Because they were the only candidates to succeed Pitchford (no Democrat ran for the office), this victory made Sewell the presumptive new superintendent. (Doc. # 52-1, at 86.) On the night of the primary, Tipton hosted a party for Sewell at her house. She later helped prepare food for a "thank-you meal" that Sewell held. (Doc. # 52-1, at 19–20, 111; Doc. # 57-2, at 35–36; Doc. # 57-7, at 16.)

Although Sewell was the heir-apparent in March, he would not start his term until the next January. *See* Ala. Code § 16-9-8(a) (stating "the successful candidate shall take office on January 1 following the date of election"). Pitchford had at first planned to retire in April and let Sewell start early. But Pitchford changed his mind after an accreditation team encouraged him to serve his full term. (Doc. # 52-1, at

71–72, 77–78.)[1]  Thus, there was a ten-month overlap between Pitchford and Sewell.  Pitchford used that time to show Sewell the ropes.  (Doc. # 52-1, at 78.)

## B.  Tipton was nominated to fill Sewell's old position.

In March 2016, Sewell was the "Accountability Coordinator/Data Manager" in the Board's central office.  (Doc. # 52-1, at 82.)  His primary victory meant that position would soon be vacant.  Pitchford recommended that Sewell advertise the position so that there would be enough time for Sewell to train his successor.  (Doc. # 52-1, at 75, 117–18.)  Sewell took that advice and posted a job description online in June 2016.  (Doc. # 52-1, at 345.)

Tipton applied for the job.  This was not her first time applying for jobs with the Board.  In fact, from 1999 to 2012, Tipton worked for the Board.  She spent most of those years at Cottonwood High School — first as a teacher and then as a counselor.  (Doc. # 52-1, at 23–27; Doc. # 57-10, at 18.)  But in 2012, Tipton asked to transfer from Cottonwood to another school.  (Doc. # 52-1, at 26–28; Doc. # 57-10, at 20; *see* Doc. # 52-1, at 222.)  The Board approved the transfer, but Tipton resigned altogether six months later.  (Doc. # 57-10, at 20; Doc. # 57-2, at 29.)  For the next few years, she worked an array of short-term jobs in other school systems.  (Doc. # 52-1, at 30–38.)  In 2016, she was working for Dothan City Schools.  Even

---

[1]  Pitchford's change of course frustrated Sewell's expectations, and it caused some friction between them.  But Sewell says "It really wasn't, like, that big of a deal."  (Doc. # 52-1, at 87.)  Plus, both Pitchford and Sewell say they got along with the other.  (Doc. # 52-1, at 78, 87, 117.)

after Tipton stopped working in the Houston County school system, however, she would apply for jobs with the Board.  Before putting her name in for Accountability Coordinator, she applied to at least nine positions, including eight after she stopped working for the Board in 2012.  (Doc. # 52-1, at 32–36, 345.)

Tipton was not the only one who applied for the Accountability Coordinator job; twenty other people did, too.  After receiving the applications, Rhonda Lassiter, the human resources director, cobbled-together an interview committee.[2]  That four-person committee interviewed eight applicants, including Tipton.  Each interviewer ranked the top applicants.  Applicant Catina Dixon got two first-place votes and two second-place votes.  Tipton got two first-place votes, one second-place vote, and one third-place vote.  (Doc. # 52-1, at 327.)  Even though Dixon had more second-place votes, Lassiter named Tipton the number-one applicant.  (Doc. # 52-2, at 15; Doc. # 57-7, at 39.  *But see* Doc. # 52-1, at 76, 123.)  Lassiter sent the interview results to Pitchford in July 2016.  (Doc. # 52-1, at 327.)  Pitchford was still the superintendent, after all.  But Pitchford said he "did not have a preference" and deferred to Sewell.  (Doc. # 52-1, at 75; Doc. # 57-7, at 39.)  Sewell decided that Tipton was the best applicant for the Accountability Coordinator position.

Yet neither Pitchford nor Sewell could unilaterally hire Tipton.  All they could

---

[2]  The committee consisted of Lassiter; Nicole Corbin, Lassiter's assistant; Roger Sanders, a school counselor; and Sharon Leroy, an assistant principal.  (Doc. # 52-1, at 236–37.)

do was recommend her to the Board.  Ala. Code §§ 16-8-23, 16-9-23; *cf. Bd. of Sch. Comm'rs of Mobile Cty. v. Weaver*, 99 So. 3d 1210, 1220 (Ala. 2012) ("The superintendent is not vested with the authority to employ or to terminate principals and teachers beyond making a recommendation to the Board.").  So in July 2016, Pitchford nominated Tipton to the Board.  (Doc. # 52-1, at 75–76, 91.)

## C.   **After a long delay, the Board voted not to confirm Tipton's nomination.**

Though Pitchford nominated Tipton in July 2016, the Board would not vote on her until ten months later, in May 2017.  There were several reasons for the delay.

The first two delays were Sewell's doing.  There was a Board meeting in July 2016, and Tipton's nomination was circulated to the Board in preparation for that meeting (on a so-called "pre-agenda").  But then, for some unknown reason, Sewell had Tipton taken off the final meeting agenda.  That meant the Board did not have the chance to vote on her at the July meeting.  (Doc. # 52-1, at 59, 77, 267, 285; *see* Doc. # 52-1, at 107.)   Tipton's nomination was next on the pre-agenda for the November 2016 meeting.  But once again, Sewell took her name off the final agenda. This time, he gave an explanation:  He did not have the votes to confirm her.  (Doc. # 52-1, at 59, 77.)

Tipton was also on the December 2016 pre-agenda.  Yet again, she did not make it to a vote.  This time, the delay was Pitchford's idea.  The December meeting was Pitchford's last meeting as superintendent, and he thought he would be

recognized at the end of it, perhaps with a reception.  If there was a debate about Tipton's nomination, it would delay whatever celebration the Board had planned for him.[3]  So Pitchford asked Sewell for permission to take Tipton off the agenda, and Sewell consented.  (Doc. # 52-1, at 62, 77, 108.)

When the January 2017 Board meeting came around, Sewell had been sworn in as superintendent, and Tipton was again on the agenda.  Still, there was more delay ahead.  Ricky Moore, a Board member and Tipton's first-cousin once-removed, took Tipton off the final January agenda.  Moore supported Tipton, and he wanted the vote of an absent member.  (Doc. # 52-1, at 109, 210–12, 277; Doc. # 57-3, at 12.)  Tipton reappeared on the February 2017 agenda, and Moore moved to confirm her.  His motion failed for lack of a second.  (Doc. # 52-1, at 213, 277.)

The Board finally voted on Tipton at its May 2017 meeting.  Since the Board can act only by majority vote, Tipton needed four Board members to confirm her nomination.  Ala. Code § 16-8-4; *Hamilton v. Montgomery Cty. Bd. of Educ.*, 122 F. Supp. 2d 1273, 1285 (M.D. Ala. 2000).  But four Board members — Defendants Jimmy Kilgore, Ken Lane, Gary Cox, and Marty Collins — voted *not* to hire her. The other three members — Ricky Moore, Scott Thomas, and David Hollinger — voted for her.  (Doc. # 52-1, at 278.)  Defendant Bobby Harrell did not (and could

---

[3] Pitchford guessed wrong.  His retirement celebration was held on a different day.  (Doc. # 52-1, at 77.)

not) vote; he had retired from the Board in October 2016, and Collins had taken his seat.  (Doc. # 52-1, at 8, 145, 191, 206.)

After the vote, Tipton sued Defendants under 42 U.S.C. § 1983 for violating the First Amendment.  (Docs. # 1, 27.)  Defendants moved for summary judgment.  (Doc. # 51.)  That motion is ripe.  (*See* Docs. # 52, 55, 57, 58, 59.)  Defendants also moved to strike evidence that Tipton submitted in opposition to summary judgment.  (Doc. # 60.)  That motion is ripe, too.  (*See* Docs. # 62, 64.)

## IV.  DISCUSSION

Everyone agrees that the First Amendment protects Tipton's association with Sewell and her political support for him.  (Doc. # 52, at 35; Doc. # 57, at 24.)[4]  It would be hard to argue otherwise.  No evidence suggests that the Accountability Coordinator position has anything to do with politics, nor is there any evidence that Tipton's campaign activities implicated any legitimate interest of the Board's.  Thus, the Board could not refuse to hire her because of her First Amendment activities.  *See, e.g.*, *Rutan v. Repub. Party of Ill.*, 497 U.S. 62, 78 (1990); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

But this case is not about whether Defendants *could* retaliate against Tipton — it is about whether they *did*.  That is a question about Defendants' knowledge and

---

[4]  Tipton's claim implicates both the freedom of speech and the freedom of association, but that does not affect the analysis.  For simplicity's sake, the court refers to "the First Amendment."

motives.  And based on the cognizable evidence, the only reasonable answer is that Defendants did not violate the First Amendment.

**A.**   **No reasonable jury could find Defendants were subjectively motivated to retaliate against Tipton based on her political activities.**

If this case were to go to trial, Tipton would have to show that Defendants were subjectively motivated, at least in part, by her First Amendment activities. *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011).  That is, she would have to prove that her protected conduct "was a 'substantial factor' — or, to put it in other words, that it was a 'motivating factor' — in the Board's decision not to [hire] her." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).  If, however, Defendants were to show that they "would have reached the same decision . . . even in the absence of [her] protected conduct," then they would be entitled to judgment as a matter of law. *Id.*

To be sure, Tipton's burden "is not a heavy one." *Stanley v. City of Dalton*, 219 F.3d 1280, 1291 (11th Cir. 2000).  Nor is there a certain formula for showing motive.  Instead, one must consider the record as a whole, including circumstantial evidence. *Id.*  Several factors guide this inquiry.  For example, was there hostility against Tipton or Sewell?  Did anyone talk about Tipton's political activities?  Is the timing suspicious?  Have the reasons proffered for not hiring Tipton changed over time?  Are the reasons pretextual?  Was Tipton's nomination treated differently than others?  Each of these factors is relevant, and none is dispositive. *See id.* at 1291

n.20; *Polion v. City of Greensboro*, 614 F. App'x 396, 399 (11th Cir. 2015) (per curiam); *Kamensky v. Dean*, 148 F. App'x 878, 881 (11th Cir. 2005) (per curiam).

But at the same time, Tipton must show there is a genuine dispute about each Defendant's motives.  Even if one Defendant had a retaliatory motive, the other Defendants are entitled to summary judgment unless there is evidence they shared that illicit motive.  *See Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006) (noting that an improper motive of one member of a commission "is not imputed to the rest"); *Mason v. Village of El Portal*, 240 F.3d 1337, 1339 (11th Cir. 2001) (requiring evidence that two board members shared a third's discriminatory motive).

There is also a prerequisite to motive: knowledge.  Before a Defendant could be motivated by Tipton's support for Sewell, he had to know about it.  No knowledge means no motive.  *See Smith v. City of Greensboro*, 647 F. App'x 976, 982–83 (11th Cir. 2016) (per curiam) (dismissing a First Amendment retaliation claim since there was no genuine dispute about knowledge) (citing *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)); *see also Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.").[5]  Thus, Tipton

---

[5] Cases about racial discrimination and statutory prohibitions on retaliation are persuasive authority in First Amendment retaliation cases.  *See, e.g.*, *Mt. Healthy*, 429 U.S. at 287 n.2 (citing

must show there is a genuine dispute about each Defendants' knowledge.

Tipton fails to meet her burden. She has no cognizable evidence that Kilgore, Lane, Cox, Pitchford, or Harrell knew about her political activities. Her evidence of Collins's knowledge is that he attended an event that Sewell hosted. And while she disputes the merits of the Board's reasons for not hiring her, she only speculates that those reasons are pretextual.

### 1.   *Evidence of Knowledge*

Defendants have met their initial burden of showing they did not know Tipton supported Sewell in the March 2016 primary. As a result, the burden shifts to Tipton to show evidence of their knowledge. But her cognizable evidence creates a genuine dispute about Collins's knowledge only; she has no cognizable evidence about any other Defendant's knowledge.

### a.   **Defendants' Evidence**

Each Defendant denies knowing about Tipton's support for Sewell. Most also specify they did not talk about Tipton's politics or try to find out who she supported. And though some Defendants remembered Tipton as a counselor who had problems at Cottonwood High School, they did not otherwise know her:

- Pitchford: "I did not know who Ms. Tipton supported in the election and did not care. . . . I never discussed who Ms. Tipton may have supported in the Superintendent's election with any member of the Board." (Doc. # 52-

---

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270–71 (1977)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265, 1268–69 (11th Cir. 2001).

1, at 78.)

- <u>Kilgore</u>:  "I did not personally know Shannon Tipton.  I did not know Shannon Tipton was a campaign supporter of [Sewell] until we received this lawsuit and I read all her claims.  I never took any action to determine if any of [Sewell's] personnel recommendations were individuals who supported him in the campaign."  (Doc. # 52-1, at 186.)

- <u>Lane</u>:  "I did not know Shannon Tipton before this lawsuit.  I only knew there was a past problem with a counselor at Cottonwood and during the recommendation process determined it was her.  I had no idea she campaigned for [Sewell] in the superintendent election. . . .  I was never a part of any conversation where there was a discussion about Shannon Tipton supporting David Sewell in the campaign."  (Doc. # 55-1, at 3; *see also* Doc. # 52-1, at 131.)

- <u>Cox</u>:  "After David Sewell was elected superintendent, the issue came up that he wanted Shannon Tipton to get the job he would be vacating.  I did not personally know Shannon Tipton when this occurred.  I had no idea that she was friends with David Sewell or that she supported him in the campaign.  I made no effort to determine who any employee or applicant for a job supported in the campaign. . . .  I learned  that Shannon Tipton supposedly helped David Sewell campaign and supported him in the campaign when I got an email about her lawsuit.  I knew nothing about it before then."  (Doc. # 52-1, at 172–73; *see also* Doc. # 168–72.)

- <u>Collins</u>:  "I did not know Shannon Tipton or who she supported in the campaign until I was made aware of this lawsuit and heard about her allegations. . . .  I have never researched any personnel recommendation of David Sewell to determine if the person recommended for a particular job helped David Sewell campaign."  (Doc. # 52-1, at 154; *see also* Doc. # 52-1, at 148–50.)

- <u>Harrell</u>:  "I did not know Ms. Tipton personally before she filed this lawsuit but I had heard of her because she was moved from Cottonwood as a counselor because she could not get along with people there. . . .  I did not know who Shannon Tipton supported in the campaign. . . .  No one ever asked me not to support a recommendation to hire Shannon Tipton because of who she supported in the campaign."  (Doc. # 52-1, at 205–06; *see also*

Doc. # 52-1, at 201–202.)

Defendants are not alone in their denials.  David Hollinger, who voted for Tipton, "did not know who she supported in the election for superintendent" until he "heard about her lawsuit."  (Doc. # 52-1, at 229.)  Dianne Hooper, an administrative assistant who worked in the central office, "did not know" Tipton supported Sewell. She also "never heard anyone talk about who [Tipton] supported."  (Doc. # 52-1, at 309.)

Tipton makes a few admissions, too.  First, she admits that only her Facebook "friends" can see her posts on that site.  Because there is no evidence she is Facebook "friends" with any Defendant, there is no evidence any Defendant saw her support Sewell online.  (Doc. # 52-1, at 15, 44, 48.)  Second, Tipton admits that she has never met Lane, that she never told him she supported Sewell, and that she has no evidence he knew about her support.  (Doc. # 52-1, at 13–14.)  Third, Tipton admits she does not know Kilgore and does not know if he saw her campaign activities.  (Doc. # 52-1, at 17.)  Fourth, she admits that she does not know if Cox knew about her support. (Doc. # 52-1, at 16.)  And fifth, she admits she does not know Collins and has never had a conversation with him.  (Doc. # 52-1, at 15.)

There is also no evidence any Defendant ever commented on Tipton's support for Sewell.  Sewell says he talked with Pitchford, Harrell, Kilgore, Cox, and Collins about Tipton's nomination.  Yet Sewell does not claim any of them made a politics-

related comment.  (Doc. # 52-1, at 90–101; Doc. # 57-2, at 16–20.)  In fact, Sewell says he never heard a Board member say anything negative about him.  (Doc. # 57-2, at 11.)  Rhonda Lassiter, the human resources director, had two conversations with Cox about Tipton's nomination.  But she does not claim that Cox (or any other Defendant) talked about Tipton's political activities.  (Doc. # 52-1, at 238–42, 248–50, 262; Doc. # 57-7, at 9, 38.)  Tipton talked to Cox about her nomination in January 2017, but she does not say he talked politics.  (Doc. # 52-1, at 9–11, 16.)  Even Ricky Moore, Tipton's cousin and a Board member, does not say that any Defendant talked about Tipton's political activities.

Thus, Defendants have met their initial burden of showing they are entitled to summary judgment.

### b.    Tipton's Evidence

Tipton responds to Defendants' evidence with little evidence of her own.  She can show a genuine dispute as to one Defendant only.  The rest is just speculation and innuendo.

The lone genuine dispute pertains to what Marty Collins knew, and it stems from Tipton's declaration in opposition to summary judgment.  She claims:

> Mr. Collins testified at his deposition, which I attended, that he did not know who I supported during the election.  He attended Mr. Sewell's "thank-you BBQ" at Mt. Enon Baptist Church.  Mr. Sewell publically [*sic*] thanked me and my husband for our support during his campaign.

(Doc. # 57-4, at 2.)  The court infers that Tipton intends to say that Collins attended

the "thank-you BBQ" and that Sewell publicly thanked Tipton at the same event. Of course, even if Collins had been at the event, a jury could find that he did not hear Sewell thank Tipton — or that he forgot about it. After all, Collins and Tipton do not know each other (Doc. # 52-1, at 15, 154), and the event might have been several months before Collins joined the Board in November 2016. There is also a puzzling question about why Collins would retaliate against her if he went to an event Sewell hosted. But at this point, the court will assume there is a genuine dispute about whether Collins knew Tipton supported Sewell.[6]

There is no genuine dispute about any other Defendant. First consider Bobby Harrell. Sometime between July 2016 and January 2017, Sewell and Moore went to Harrell's house to ask him to vote for Tipton. (Doc. # 52-1, at 200, 206, 218.) Moore asserts that, during their conversation, Harrell said Tipton's appointment had "Done got too political." (Doc. # 57-3, at 13.) That is not evidence of knowledge. Harrell did not say *Tipton* was "too political," or that Sewell's *decision* to nominate her was "too political." Instead, Tipton's attorney interprets Harrell's remark as saying "the situation" had grown "too political." (Doc. # 57, at 10.) That does not

---

[6] Defendants argue Tipton's declaration is a "sham." (Doc. # 60.) In Tipton's deposition, however, counsel asked if Collins attended a "campaigning event" for Sewell. Tipton's answer: "I don't know." (Doc. # 52-1, at 15.) Because she did not give an unambiguous "no," and because the BBQ might not have been a "campaigning event," this part of her declaration is not a "sham." *See Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (requiring "clear answers to unambiguous questions" for a declaration to be a sham) (quoting *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).

call into question Harrell's insistence that he did not know (and did not talk about) who Tipton supported.  (Doc. # 52-1, at 200, 206.)  And neither Sewell nor Moore provide any context that could let one reasonably infer that Harrell was talking about Tipton's political activities.

Tipton points out that Ken Lane and Jimmy Kilgore are related to Matt Swann, the candidate Sewell defeated in March 2016.  Kilgore is Swann's stepfather, and Lane is his father-in-law.  (Doc. # 52-1, at 186; Doc. # 55-1, at 2.)  Moreover, Lane actively campaigned for Swann.  He went to a dinner, put up a sign near his house, and campaigned "four to five hours in a day."  (Doc. # 52-1, at 129–30.)  Kilgore also supported Swann, though his assistance was limited to helping Lane put up two signs.  (Doc. # 52-1, at 180–81.)  Kilgore and Lane were disappointed when Swann lost, and the court assumes that other people knew about their disappointment.[7]  But none of this shows Lane and Kilgore knew about Tipton.  It is speculation to say that because they supported Swann, they must have known someone who helped Sewell.[8]

---

[7]  Moore claims that Lane was "pretty vocal about the loss," though Kilgore's reaction was not "that bad."  (Doc. # 57-3, at 8.)  It is unclear what that means.  (What did they say?  When did they say it?)  Tipton also alleges that Kilgore and Lane were "angry" that Swann lost.  (Doc. # 57-4, at 2.)  She offers no facts to explain what she means.  (Is she speculating about their emotions? Is she referring to their actions?)  When Defendants moved to strike this allegation (Doc. # 60, at 4–5), she did not defend it (*see generally* Doc. # 62).  Thus, the court will strike Tipton's vague, conclusory, and possibly speculative claim that Kilgore and Lane were "angry."  And because anger does not equal knowledge, Tipton's claim would not defeat summary judgment anyway.

[8]  Tipton also claims that Pitchford supported Swann.  She has no evidence that either Cox or Harrell supported Swann.  (*See* Doc. # 52-1, at 159, 205.)  But again, supporting Swann did not automatically confer knowledge of everyone who supported Sewell.

Tipton asks the court to infer knowledge based on 2017 population estimates. That year, there were an estimated 104,346 people in Houston County. An estimated 68,202 (including 51,970 adults) lived in the City of Dothan, while the other 36,144 (including 28,168 adults) lived outside Dothan but inside the county. (Doc. # 57-17.) Dothan residents do not vote for the county superintendent of education. Thus, the voting-age population for the superintendent election was 28,168. But so what? Dothan is not sealed-off from the rest of the county; Defendants would have known people who could not vote in the election. And it is speculation to claim that, simply because Defendants lived in one of the largest counties in the state, they knew about someone who helped Sewell campaign for office.

Next, Lassiter asserts that it was "common knowledge" that Tipton supported Sewell. (Doc. # 57-7, at 16–17, 37.) Tipton says something similar. (Doc. # 57-4, at 2.) But this conclusory allegation does not show knowledge. *See Hall v. Tollett*, 128 F.3d 418, 426 (6th Cir. 1997) (dismissing a First Amendment retaliation claim when the plaintiff merely alleged his political support was "common knowledge"); *see also Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 87 (2d Cir. 2005) (holding that allegations of "common knowledge" were "too conclusory to support a reasonable inference" of knowledge); *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 962 (11th Cir. 1997) (rejecting an assertion that was based, in part, on "common knowledge"). It is speculation to claim that because an unspecified number of unnamed people

20

knew about Tipton's actions, Defendants must have known about them, too.

Finally, Tipton points out that knowledge and credibility are questions of fact. Thus, she argues, she gets to go to a jury. But courts still grant summary judgment in cases about motive. And a conclusory allegation that a Defendant lacks credibility does not defeat summary judgment; evidence is required. *See, e.g.*, *Ekokotu v. Fed. Express Corp.*, 408 F. App'x 331, 338 (11th Cir. 2011) (per curiam); *Hamrick v. Am. Cas. Co. of Reading*, 245 F. App'x 891, 894 n.3 (11th Cir. 2007) (per curiam); *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994). Such evidence is missing here.

In sum, there is no genuine dispute about whether Pitchford, Kilgore, Lane, Cox, and Harrell knew that Tipton supported Sewell. They are entitled to summary judgment on that basis alone. *See Smith*, 647 F. App'x at 983.

### 2.   *Evidence of Motive*

Defendants also meet their burden of showing that they were not motivated by Tipton's support for Sewell. Tipton lacks sufficient cognizable evidence to let a reasonable jury conclude otherwise.

### a.   **Defendants' Rationales**

Each Board member who voted against Tipton says he thought there was no need to fill the Accountability Coordinator position and that he voted against hiring Tipton to save money. Marty Collins put it this way:

> I did not support [the] recommendation [to hire Tipton] because I did
> not want to fill the position.  I believe the board has to be very careful
> about how money is spent and I wanted to see if the accountability
> responsibilities could be handled by other employees in [the] central
> office.  When David Sewell asked me to support his hiring of Shannon
> Tipton, I told him that.   I would not have voted to support David
> Sewell's recommendation regardless of who he recommended for the
> job.

(Doc. # 52-1, at 153; *see also* Doc. # 52-1, at 132–33, 149, 161, 173–74, 186–87;

Doc. # 55-1, at 2–3; Doc. # 57-12, at 7.)

This concern was not a secret.  Sewell admits Collins asked about whether the

Accountability Coordinator role could be consolidated with other jobs.  (Doc. # 52-

1, at 100, 106; Doc. # 57-2, at 41.)  Pitchford agrees that Kilgore voiced this concern.

(Doc. # 52-1, at 65.)  Scott Thomas was "aware that some board members did not

want to fill the position." (Doc. # 52-1, at 226.)  And David Hollinger recounts that

"Board members were deciding whether we should hire anyone in the position for

money reasons."  (Doc. # 52-1, at 228.)  Indeed, Hollinger "had some of the same

concerns," just as Thomas "had concerns about whether [to] approve" Tipton.  (Doc.

# 52-1, at 226, 228.)

Defendants present evidence that they were right not to hire an Accountability

Coordinator.  The duties of that position are, in fact, being performed by other people

for less money than it would cost to hire a full-time coordinator.  Cas Haddock, who

already worked for the Board when Tipton was nominated, has absorbed most of the

work that Tipton would do.  (Doc. # 52-1, at 260, 322, 325.)  A part-time contractor

does the rest.  (Doc. # 52-1, at 103, 260, 322.)  An Accountability Coordinator would make $90,000 a year plus benefits.  Subtract the contractor's $31,000 salary and a $15,000 raise Haddock got in 2018, and the Board saves about $44,000 a year (plus benefits).  All state-required work is completed by this arrangement, and the Board gets "high marks" on accountability from the State.  (Doc. # 52-1, at 104, 121.)

Board members who voted against hiring Tipton also expressed concern about Tipton's work history.  Gary Cox, for example, asked questions about Tipton's time at Cottonwood High School.  (Doc. # 52-1, at 164–66, 175.)  He claimed to hear that when Tipton left Cottonwood in 2012, she left it "in a mess."  (Doc. # 52-1, at 9; *see* Doc. # 52-1, at 94–95.)  The Cottonwood principal told Cox that parents accused Tipton of favoring her own child.  (Doc. # 52-1, at 66.)  In addition, Rhonda Lassiter told Cox that a member of the committee that interviewed Tipton in 2017 said every school counselor would quit if Tipton was hired.  (Doc. # 52-1, at 239–42, 248–49.)  In the end, Cox says he did not think it was best to hire someone "who possibly had past performance issues as an employee of our school system," "especially" for a central office position.  (Doc. # 52-1, at 175.)

Like Cox, Kilgore says he "thought it was problematic to rehire an individual that had past performance issues, specifically problems getting along with others, in a central office position."  (Doc. # 52-1, at 186; see Doc. # 52-1, at 182–83.)  Sewell agrees that Kilgore voiced these concerns.  (Doc. # 52-1, at 96–97.)  Lane also states

that though he did not know Tipton personally, he "knew there was a past problem with a counselor at Cottonwood and during the recommendation process determined it was her."  (Doc. # 55-1, at 3.)

Others recognized the concern about Tipton's past performance.  Harrell said he could not vote for someone who "had problems getting along with people when she worked with us before."  (Doc. # 52-1, at 206; *see* Doc. # 52-1, at 200.)  Sewell and Moore confirm that Harrell expressed concern about Tipton's history.  (Doc. # 52-1, at 93; Doc. # 52-1, at 220.)  And both Thomas and Hollinger say that other Board members were concerned about Tipton's ability to get along with others.  Hollinger had a similar concern himself.  (Doc. # 52-1, at 226, 228.)

Moving past subjective rationales, Defendants point out that Tipton is the only person nominated by Sewell whom the Board has not confirmed.  (Doc. # 52-1, at 102–93, 112–16.)  In fact, Sewell thinks that his other four nominees were confirmed unanimously.  (Doc. # 52-1, at 116.)

Defendants also address purported irregularities.  They present evidence that Tipton is not the first personnel nomination ever to face Board opposition.  Pitchford had nominations fail for lack of a motion.  (Doc. # 52-1, at 70.)  Lane also remembers voting against Pitchford, and both Lane and Cox remember times when the Board did not accept a superintendent's recommendation.  (Doc. # 52-1, at 135–36, 174; Doc. # 55-1, at 3.)  To be sure, Pitchford never had a nominee voted down.  But that

is because Pitchford would "feel out" the Board in advance, and he would not put a recommendation up for a vote if it would not pass. (Doc. # 52-1, at 75–76, 172, 185, 206; Doc. # 55-1, at 3.)

When Tipton's name was on the July 2016 pre-agenda, it was on a separate agenda page. Dianne Hooper, an administrative assistant for the superintendent and the Board, says that was her doing. She explained that putting an item on a separate page was the usual practice when the agenda item required more discussion. (Doc. # 52-1, at 266, 297, 309–10.) Cox remembers it happening before. (Doc. # 52-1, at 163.)

Finally, when Tipton's name was on the July 2016 pre-agenda, Pitchford had Hooper note in parentheses that Tipton was Sewell's pick. Pitchford denies that he was trying to send a political message. Instead, he was trying to let Board members know that Sewell had made the selection even though Pitchford was superintendent. (Doc. # 52-1, at 76, 267.) Sewell did not object to the note, and he lacks evidence it was politically motivated. (Doc. # 52-1, at 118.)

Defendants have thus met their burden of showing that they lacked retaliatory motive. The burden now shifts to Tipton.

### b.   Evidence of Pretext

Tipton argues at length that the Board's reasons are pretextual. But a pretext inquiry must recognize that a Defendant can act "for a good reason, a bad reason, a

reason based on erroneous facts, or for no reason at all" so long as he does have a retaliatory reason. *Nix v. WLCY Radio/Rahall Comm'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). As a result, the pretext inquiry "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010). Tipton must do more than argue that Defendants got the facts wrong or acted unwisely; she must show evidence that Defendants did not actually possess their proffered reasons. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997).

Tipton argues it is a bad idea to leave the Accountability Coordinator position unfilled. Sewell knows that position well (it was his), and he wants someone in the job full-time. (Doc. # 52-1, at 104; Doc. # 57-2, at 22, 24, 41–43.) Even though all the work is getting done, the current setup creates a "hardship," and Sewell does not think it is a feasible setup. (Doc. # 57-2, at 41–42, 122.) In addition, Cox and Collins are less informed than Sewell; they do not know all the Accountability Coordinator's responsibilities. (Doc. # 57-12, at 7–8.)[9] These arguments, however, merely quibble

---

[9] Sewell says it takes up "some" of his time to train the part-time contractor. (Doc. # 52-1, at 260; Doc. # 57-2, at 37.) Tipton seizes on this as evidence that the Board is wrong about its cost savings. But there is no evidence about how much time Sewell spends training the contractor. Nor is there evidence that Sewell gets paid more for helping the contractor or that it causes Sewell to neglect his other duties in a way that costs money. If Sewell gets paid a fixed salary and simply does more work to help out, then it does not appear that it would cost the Board anything. And even if the Board was wrong about saving money, that would not necessarily show motive.

with the Board's judgment.  The Board has a duty to safeguard taxpayer dollars.  *Cf.* Ala. Code §§ 16-6B-4, 16-13A-1.  That the superintendent wants to spend money does not mean the Board is lying about its contrary fiscal concerns.[10]

The court assumes that, objectively speaking, Tipton did not cause problems at Cottonwood High School and that the principal is to blame for creating a negative "atmosphere." (Doc. # 52-1, at 28.)  But Tipton lacks evidence that Board members did not, subjectively speaking, believe that she had problems.  Perhaps Cox, Kilgore, Lane, and Harrell might have found the truth if they had dug a little deeper.  Perhaps they should have believed Lassiter, Sewell, and Tipton's claims that Tipton was not at fault for anything.  But if Defendants were not convinced — if they thought the risk of hiring a bad apple was not worth it — there is no pretext.

After all, rumors circulated about Tipton's tenure at Cottonwood.  Tipton says she had no reason to disbelieve Cox when he told her that he heard about problems at Cottonwood.  (Doc. # 52-1, at 11.)  Ricky Moore, Tipton's cousin, admits he told people that Tipton is hard to get along with.  (Doc. # 52-1, at 222–23.)  Kilgore, Harrell, and Lassiter heard Moore say that she is hard to get along with.  (Doc. # 52-1, at 183, 195, 200, 261–62.)  And Lassiter told Cox that someone who interviewed

---

[10]  Tipton criticizes Defendants for their "sudden burst of frugality" because they did not propose leaving the Accountability Coordinator position open until Tipton was the nominee.  (Doc. # 57, at 12.)  But that ignores that Sewell was in the position until Tipton was nominated.  There is a difference between wanting to leave a position open and firing an existing employee.

Tipton said that every school counselor would quit if Tipton was hired.  Even taken as "bluster," that claim reflects poorly on Tipton.[11]

Tipton claims that she is being held to a double-standard and that the double-standard is evidence of pretext.  She is, for example, the only Sewell nominee who has not been confirmed.  Because there is no evidence the other nominees supported Sewell, and because the other nominees were administrators when Pitchford was in charge (Doc. # 57-4, at 2), she assumes that she was treated differently based on her affiliation with Sewell.  But there is no evidence of any fiscal concerns or personality concerns about the other nominees, either.  And if Tipton is the victim of retaliation for supporting Sewell, somehow that retaliation never extended to Sewell himself.

Tipton claims that Board members "very rarely" investigated nominees.  She even says Cox waged a "crusade" against her, which presumably refers to him asking questions about her.  (Doc. # 57-4, at 2.)[12]  But she has no response to Cox's claim that he looked into other nominations in the past.  (Doc. # 52-1, at 175.)  Nor does she respond to the claim that Board members more closely examined nominees for

---

[11]  In her brief, Tipton makes the following claim:  "Sewell testified that all of the reasons the Board gave for not voting for Ms. Tipton were false."  (Doc. # 57, at 3.)  That misrepresents the evidence.  In his deposition, Sewell was asked if there was "any reason for the board not to approve" Tipton.  "Not that I'm aware of," Sewell responded. (Doc. # 57-2, at 46–47.)  That is a far cry from testifying that the Board members gave pretextual reasons for their decision.

[12]  To the extent that Tipton's "crusade" remark refers to anything more than what is in the record, it is vague and conclusory.  Defendants moved to strike the remark (Doc. # 60, at 4), and Tipton did not defend it (*see generally* Doc. # 62).  The court will thus treat it as mere argument.

central office positions.  (Doc. # 52-1, at 172, 185, 206.)

According to Rhonda Lassiter, the Board once hired a principal named David Stewart even though he had been arrested for domestic violence.  But Tipton has no evidence — not even Lassiter's say-so — that the Board knew about Stewart's arrest when it hired him.  Nor is there any evidence about which Board members voted for Stewart.  The most Lassiter says about the arrest is that Pitchford "did know about it."  (Doc. # 57-7, at 20.)  Yet she does not explain how Pitchford knew, except to say that it was her "understanding" that Pitchford and Stewart "knew each other." (Doc. # 57-7, at 21.)  Lassiter also says the Board hired Brandi Paramore despite her history of workplace discipline.  (Doc. # 57-7, at 21–22.)  But Lassiter does not remember when Paramore worked for the Board.  (Doc. # 57-7, at 21.)   Nor does Lassiter say when the discipline happened.  Nor does she say that the Board was aware of those issues.

Tipton maintains that Kilgore and Lane's relation to Swann gave them motive to retaliate against her.  She believes that Kilgore and Lane have outsized influence over other Board members, stating that "no action could pass the board without their approval."  (Doc. # 57-4, at 2.)  She relies on a local blogger for support.  (Doc. # 58-1.)  But Tipton lacks personal knowledge about the Board's inner workings, and so does the blogger.  In addition, the blogger did not provide a sworn statement, so what he wrote online is not cognizable evidence.  *See Gordon v. Watson*, 622 F.2d 120,

123 (5th Cir. 1980) (per curiam).  It is therefore speculation to claim that Kilgore and Lane controlled other Board members.  And though Swann's loss disappointed Kilgore and Lane, Tipton lacks evidence of knowledge and pretext.

Tipton might argue that temporal proximity is evidence of causation here.  But since no reasonable jury could find Defendants knew that Tipton supported Sewell, mere temporal proximity creates no genuine dispute.  *Brungart*, 231 F.3d at 799. There is also too long of a gap between Tipton's campaign activities and any adverse action.  Sewell became the presumptive superintendent in March 2016.  He did not nominate Tipton until July 2016.  Tipton never made it onto a final Board agenda until January 2017, and the Board did not vote on her until May 2017.  This timeline does not, by itself, show causation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("A three to four month disparity between the . . . protected expression and the adverse employment action is not enough."); *see also Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1156 (11th Cir. 2002).  As a result, temporal proximity cannot carry this case to trial.

So in the end, Tipton falls back on the "feeling" or "belief" that she suffered retaliation.  (Doc. # 57-2, at 23; Doc. # 57-3, at 14; Doc. # 57-7, at 38; Doc. # 57-10, at 6.)  That is not enough. *See Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge.").  Pitchford, Harrell, Kilgore, Lane, Cox, and Collins are thus entitled to summary judgment.

**B.**   **Defendants are also entitled to qualified immunity.**

Tipton sued the individual Defendants in their individual capacities, and they invoke qualified immunity.  That doctrine "protects government officials performing discretionary functions from civil trials . . . and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996).  In a First Amendment retaliation claim, this doctrine asks if a defendant was "indisputably" motivated, at least in part, by lawful considerations.  *Stanley*, 219 F.3d at 1295–96.  If he was, and if his lawful considerations could have justified a reasonable official's conduct, the defendant has qualified immunity.  *Id.*; *see Rioux v. City of Atlanta*, 520 F.3d 1269, 1283 (11th Cir. 2008); *Foy*, 94 F.3d at 1534.

At minimum, Pitchford and Harrell are entitled to qualified immunity.  The only things Pitchford did that could have hurt Tipton's chance of getting hired were (1) writing Sewell's name next to Tipton's on the July 2016 pre-agenda; and (2) taking Tipton off the December 2016 agenda.  Pitchford says he included Sewell's name on the July 2016 pre-agenda to give accurate information to the Board.  He got Sewell's consent to take Tipton off the December 2016 agenda since he anticipated a retirement party.  Those are lawful reasons, and a reasonable superintendent could have been motivated by them.  Tipton offers no evidence to dispute either rationale.  Thus, Pitchford is entitled to qualified immunity.

Harrell is also entitled to qualified immunity.  He was not on the Board when Tipton lost the vote.  There is no evidence he took any action against Tipton; at most, he said that "the situation" surrounding her nomination had become "too political."  It was not "clearly established" that he could violate the First Amendment simply by discussing Tipton's nomination when he never had the chance to vote on her.

**C.**     **The Board is not liable because its members are not liable.**

In addition to the six individual Defendants, Tipton sued the Board itself under 42 U.S.C. § 1983.  The Board is not subject to *respondeat superior* liability, though; it is liable only for its own policies and customs.  *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978); *Grech v. Clayton Cty.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).  Because no one person could hire Tipton, there is no individual policymaker in this case.  *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004) ("A member or employee of a governing body is a final policy maker only if his decisions have legal effect without further action by the governing body, and if the governing body lacks the power to reverse the member or employee's decision.").  Thus, the question is why "the Board" as an entity decided not to hire Tipton.  *See Mt. Healthy*, 429 U.S. at 287.

According to the Eleventh Circuit, the Board is not liable as an entity unless a majority of its members had an unconstitutional motive.  *See Campbell*, 434 F.3d at 1313 (holding a district court erred in denying judgment as a matter of law when

there was no evidence "that a majority of the members of the final policymaker . . . acted with an unconstitutional motive"); *Matthews v. Columbia County*, 294 F.3d 1294, 1298 (11th Cir. 2002) (per curiam) (affirming summary judgment for a county when there was no evidence a majority of county commissioners shared the illegal motive); *Mason*, 240 F.3d at 1339 (similar); *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994) (similar).[13]  That rule recognizes that because the Board can act only by majority vote, it would be incongruous to let a minority subject the Board to liability.  *See Scott-Harris v. City of Fall River*, 134 F.3d 427, 438 (1st Cir. 1997), *rev'd on other grounds sub nom.*, *Bogan v. Scott-Harris*, 523 U.S. 44 (1998). And if less than a majority could subject the Board to liability, a well-intentioned Board member who knew that another member had an illicit motive would have to either (1) vote against his own view of what was best, or (2) subject the Board to the risk of legal liability.  *Matthews*, 294 F.3d at 1295.

Kilgore, Lane, Cox, and Collins are entitled to summary judgment because there is no genuine dispute about whether they had a retaliatory motive.  As a result, the Board is not liable, either.

---

[13]  In *Quigg v. Thomas County School District*, 814 F.3d 1227, 1234 (11th Cir. 2016), the court did not require proof that a majority of a school board committed gender discrimination.  But *Quigg* did not cite any of the cases above or discuss municipal liability; it instead looked at a Title VII case.  The Supreme Court has never decided how many votes it takes to subject a municipal entity to liability.  And "where there are inconsistent panel decisions, the earliest panel opinion resolving the issue in question binds this circuit until the court resolves the issue en banc." *Combs*, 106 F.3d at 1532 (cleaned up).  So *Campbell*, *Matthews*, *Mason*, and *Church* control.

**D.**     **Defendants are not liable for Dianne Hooper's actions in 2017.**

One final issue concerns the Board's administrative assistant, Dianne Hooper. Around June 2017, Sewell recommended Tipton for a part-time summer job doing "gifted testing" for about 150 students.  Rhonda Lassiter emailed Sewell and Hooper about it.  (Doc. # 52-1, at 285, 328; Doc. # 57-2, at 30.)  But Tipton's nomination did not make it to the Board for a vote.  Hooper knew that Tipton planned to file this action, and Hooper wanted to talk with the Board's attorney before she put Tipton's name on a meeting agenda.  (Doc. # 52-1, at 268–69, 285; Doc. # 57-2, at 31–32.) Hooper allegedly said that the Board should not hire Tipton because of this case. (Doc. # 52-1, at 258.)

But Tipton does not dispute Hooper's testimony that she acted in her capacity as the Board's assistant.  (Doc. # 52-1, at 287, 309; Doc. # 57-2, at 32.)  There is no evidence or argument that Hooper is a policymaker.  Nor does Tipton show evidence to contradict Hooper's claim that she did not discuss Tipton's lawsuit with any Board members.  (Doc. # 52-1, at 270–71, 309.)  Finally, Tipton does not present evidence to contradict Defendants' claim that they had no knowledge whatsoever about the summer job.  (Doc. # 52-1, at 154, 175, 187, 226, 229; Doc. # 55-1, at 3.)

Because Hooper acted alone, is not a Defendant, is not a Board member, and did not act based on a Board policy or custom, the Board cannot be liable for her actions.  And because Defendants did not know about the summer job or Hooper's

actions, it creates no genuine dispute about their motives.

## V.  CONCLUSION

For the reasons above, it is ORDERED that Defendants' Motion for Summary Judgment (Doc. # 51) is GRANTED and that Defendants' Motion to Strike (Doc. # 60) is GRANTED IN PART and DENIED IN PART.

Final Judgment will be entered separately.

DONE this 20th day of May, 2019.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE